JOSEPH J. ENRIGHT, JR., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Enright v. Commissioner
Docket No. 5659-75.
United States Tax Court
T.C. Memo 1976-393; 1976 Tax Ct. Memo LEXIS 6; 35 T.C.M. (CCH) 1770; T.C.M. (RIA) 760393; December 27, 1976, Filed *6 Petitioner continued to serve as president of Fotocrafters after the sale of all its operating assets to Gateway, which adopted Fotocrafters' qualified employees' trust. Since petitioner did not become an employee of Gateway, he was ineligible to participate in the trust after the sale to Gateway was consummated and his entire interest therein was distributed to him. Held, petitioner was separated from the service of his employer within the meaning of sec. 402(a)(2), I.R.C. 1954, as in effect during 1971, because the sale of Fotocrafters' operating assets caused a substantial and radical change in his employment relationship, and the distribution was paid on account of petitioner's separation from the service of his employer. Thomas E. King,Harry A. Morris, and Gregory M. Kratofil, for the petitioner. George T. Morse, III, for the respondent. FORRESTER
MEMORANDUM FINDINGS OF FACT AND OPINION FORRESTER, Judge: Respondent has determined a deficiency in petitioner's Federal income tax for the taxable year 1971 in the amount of $22,357.62. The sole issue presented for our decision is whether a lump-sum distribution to petitioner from a qualified employees' trust was made on account of his "separation from the service" so that the amount of such distribution is long-term capital gain within the meaning of section 402(a)(2). [1]
FINDINGS OF FACT All of the facts have been stipulated and are so found. Joseph J. Enright, Jr. (hereinafter petitioner), unmarried in 1971, *8 resided in Kansas City, Missouri, at the time he filed the petition herein. He filed his Federal income tax return for the year 1971 with the Internal Revenue Service Center, Kansas City, Missouri. On April 2, 1947, Fotocrafters, Inc. (hereinafter Fotocrafters), was incorporated for the purpose of engaging in the business of processing black-and-white film. Petitioner was the sole stockholder and president of Fotocrafters. On February 4, 1957, Fotocrafters incorporated Rainbow Color Film Service, Inc. (hereinafter Rainbow), as a wholly owned subsidiary for the purpose of engaging in the business of processing color film. On December 31, 1962, Fotocrafters and Rainbow established a profit-sharing plan, known as the "Fotocrafters, Inc. Employees' Profit Sharing Plan" (hereinafter Plan), which covered the employees of both corporations. The Internal Revenue Service determined that the Plan was a "qualified plan" under section 401 and following. The Plan contained the following provision: 1.5 The word "employer" includes Fotocrafters, Inc., a corporation organized under the laws of the State of Missouri, and having its principal office at Kansas City, Missouri, its wholly *9 owned subsidiary, Rainbow Color Film Service, Inc., a corporation organized under the laws of the State of Kansas and having its principal office at Kansas City, Kansas, and any wholly owned subsidiary which, with the consent of Fotocrafters, Inc., shall adopt this Plan, and means any such corporation or all such corporations as the context may require.
The Plan provided for termination benefits to those employees whose service terminated for some cause other than retirement, disability, or death, in the form of a lump-sum cash distribution of an amount computed in accordance with the provisions of the Plan. The Plan could be amended by the board of directors of Fotocrafters subject to certain restrictions. On December 31, 1962, Fotocrafters and Rainbow, as employers under the Plan, and Commerce Trust Company of Kansas City, as trustee, entered a trust agreement which established the Fotocrafters, Inc., Profit Sharing Trust (hereinafter Trust) in order to effectuate the purposes of the Plan. On May 4, 1970, a plan for the merger of Rainbow into Fotocrafters was adopted by the board of directors and approved by the shareholders of Fotocrafters. Under this merger plan, the name *10 of the surviving corporation would be changed to Rainbow Color Film Service, Inc. (hereinafter New Rainbow). On June 1, 1970, the name Fotocrafters, Inc., was changed to Rainbow Color Film Service, Inc. (New Rainbow), pursuant to an amendment in the articles of incorporation. In late 1970, Jack Doak, an executive in charge of the photofinishing department for the GFS Corporation group (hereinafter Gateway), questioned petitioner about the possibility of selling New Rainbow's color film processing business to Gateway. Subsequent negotiations, which were conducted by petitioner on behalf of New Rainbow and by Barney L. Goldberg, president of Gateway, on its behalf, led to an agreement in March 1971 for the sale of all New Rainbow's operating assets to Gateway. Under this agreement, which was to be closed on April 1, 1971, Gateway intended to acquire an operating photofinishing business and to retain all employees necessary for the orderly conduct of such business. In March 1971, the Trust was amended, effective March 31, 1971. This amendment provided, in part, that (1) the name of the Trust should be changed to Rainbow Employees' Profit Sharing Trust, and (2) the term "employer" *11 should be defined to include any corporation to which any or all of New Rainbow's assets "might at any time be transferred if said transferee adopts and assumes the obligations of the Plan and Trust." Also in March 1971, Gateway adopted a second amendment to the Trust, effective April 1, 1971, amending the Trust to conform and be identical in all respects to the Gateway Sporting Goods Company Profit Sharing Retirement Trust as amended therein. On April 1, 1971, the agreement for the purchase of the New Rainbow assets (including the trade name) by Gateway was closed. All employees of New Rainbow, with the exception of petitioner (approximately 25 in number), became employees of Gateway. However, Gateway at no time employed or attempted to employ petitioner nor did petitioner at any time seek to be employed by Gateway. At the time of the sale, petitioner was approximately 63 years old and had been engaged in the photofinishing business for approximately 38 years. As a condition of sale, petitioner personally executed a covenant not to compete with Gateway in the photofinishing business in the "Greater Kansas City Area" for a period of three years. Since March 31, 1971, petitioner *12 has not been employed by any company engaged in the photofinishing business. When the sale agreement with Gateway was closed on April 1, 1971, New Rainbow's name was changed back to Fotocrafters. Prior to such sale, Fotocrafters (formerly New Rainbow) had been engaged in the color film processing business and petitioner, as its chief operating officer, was responsible for all of the sales, production, delivery, and planning aspects of the New Rainbow operations. Since the sale to Gateway, Fotocrafters has engaged solely in the passive activity of receiving interest on approximately 10 Federal, state, and municipal bonds. The Commerce Trust Company of Kansas City, Missouri, now holds and has always held all of such bonds and receives the interest on them as the paid agent of Fotocrafters. Petitioner's responsibilities since the sale to Gateway consist of executing all documents necessary to preserve Fotocrafters' corporate status, filing Federal and state income tax returns, and filing other required corporate reports. Petitioner has not received any compensation from Fotocrafters for his services to it since March 31, 1971. On April 7, 1971, petitioner requested certain *13 information from a representative of the City National Bank & Trust Company, the new trustee of the Trust, regarding his possible continued participation in a qualified plan in some other form. However, the Plan did not provide for the continued participation of petitioner since he was not an employee of Gateway. On May 12, 1971, the advisory committee for the Trust (in a letter signed "B. L. Goldberg, member") notified the trustee that petitioner's employment had terminated on April 1, 1971, and directed the trustee to pay petitioner, in a lump sum, an amount equal to 100 percent of his account balance in the Trust. On May 24, 1971, a representative of the trustee advised petitioner of his account balance in the Trust as of March 31, 1971, and enclosed a check for $72,100.78, the full amount of such account balance. Petitioner reported $1,000 of such distribution as ordinary income and the remainder, totaling $71,110.78, as capital gain on his 1971 Federal income tax return.In his statutory notice, respondent determined the full amount of such distribution to be ordinary income. OPINION We must decide whether an amount totaling $71,110.78, which petitioner received in 1971 *14 as a lump-sum distribution from a qualified employees' trust, is capital gain pursuant to section 402(a)(2), [2] as in effect during 1971. Such section provides capital gains treatment for distributions from an employees' trust provided that: (1) The trust is exempt from tax under section 501(a); (2) The distributions represent the distributee's entire interest in the trust and are paid within one taxable year of the distributee; and (3) The distributions are paid on account of the employee's death or "other separation from the service." *15 Respondent contends that the distribution was not paid on account of petitioner's separation from the service because petitioner continued to serve as president (and the only employee) of Fotocrafters after the sale of its photofinishing business to Gateway, which adopted the Plan and the Trust and assumed the obligations of the employer thereunder. We disagree.
There are numerous cases in this area where respondent has sought and obtained ordinary income treatment of distributions where the employee went to work for the transferee corporation on the theory that there was only a formal and technical change in the employment relationship, e.g., Victor S. Gittens,49 T.C. 419 (1968). In the instant case, however, respondent changes his position to maintain that we should deny capital gains treatment merely because there is no formal change in employers even though the facts show a substantial change in the employment relationship. We will not do so because we believe the change that occurred in petitioner's employment relationship with Fotocrafters, as a result of the sale to Gateway, was so substantial that there was a separation from the service of his *16 employer within the meaning of section 402(a)(2). Before the sale to Gateway, Fotocrafters had approximately 26 employees, but, with the exception of petitioner, all of these employees became Gateway employees after the sale. Therefore, at the time of the sale to Gateway, there was a substantial change in the makeup of Fotocrafters' employees which indicates that petitioner, who remained with Fotocrafters, was separated from the service of his employer. United States v. Haggart,410 F. 2d 449 (8th Cir. 1969); United States v. Johnson,331 F. 2d 943 (5th Cir. 1964); Maurice Osterman,50 T.C. 970 (1968); Victor S. Gittens,supra.
The sale to Gateway also caused a radical transformation in the business of Fotocrafters and a substantial change in the duties that petitioner performed as an employee of Fotocrafters, both of which indicate that petitioner was separated from the service of his employer. Greenwald v. Commissioner,366 F. 2d 538 (2d Cir. 1966), affg. in part and revg. on another issue 44 T.C. 137 (1965); United States v. Johnson,supra; McGowan v. United States,277 F. 2d 613 (7th Cir. 1960); *17 Victor S. Gittens,supra.
The facts of Greenwald v. Commissioner,supra, are remarkably similar to those in the instant case. The taxpayer in Greenwald was a principal officer of a corporation engaged in the manufacture and sale of women's hosiery. In late 1953, the hosiery corporation sold all of its assets to another corporation. At the time of this sale, 59 of the 60 participating employees in the hosiery corporation's profit-sharing trust left its employment. The taxpayer remained as the sole participant in the trust, the corporation changed its name, and it engaged solely in the investment business until 1959 at which time it was dissolved. After the dissolution, the trust transferred the taxpayer's entire interest to him. The Tax Court held that the trust was not exempt in 1959 so that the distribution was taxable as ordinary income. Harold D. Greenwald,44 T.C. 137 (1965). The Court of Appeals for the Second Circuit agreed that the trust was not exempt in 1959 but it held (366 F. 2d at 541) -- the amount standing to taxpayer's credit on the books of the Madison Trust on March 31, 1954-- some *18 $90,281.08--apparently would have been taxable at capital gains rates had it been distributed to taxpayer within the taxable year on account of his separation from service. The other employees of Interstate most probably received capital gains treatment as to the amounts distributed to them. It would be harsh to treat taxpayer differently, merely because he stayed on with the same employer after the radical transformation of its business. [Emphasis supplied.] In the instant case, Fotocrafters was actively engaged in the photofinishing business before the sale to Gateway, and petitioner had responsibility, as chief operating officer, for all of the sales, production, delivery, and planning aspects of the photofinishing operations. However, since the sale of its photofinishing business, Fotocrafters has been engaged solely in the passive activity of receiving interest on approximately 10 bonds which are held by a trust company which receives the interest thereon as the compensated agent of Fotocrafters. Petitioner's duties, since the sale to Gateway, have been limited to executing all documents necessary to preserve the corporate status of Fotocrafters, filing Federal and *19 state income tax returns, and filing other required reports. Moreover, petitioner had been engaged in the photofinishing business for approximately 38 years, but this relationship was severed when Fotocrafters sold its photofinishing business, which included all of its operating assets, to Gateway. As a condition of the sale, petitioner personally executed a covenant not to compete with Gateway in the photofinishing business in the "Greater Kansas City Area" for a period of three years. Accordingly, we hold that petitioner was separated from the service of his employer because the sale of Fotocrafters' photofinishing business to Gateway caused a substantial change in the makeup of Fotocrafters' employees, a radical transformation in Fotocrafters' business, and a substantial change in the duties that petitioner performed as an employee of Fotocrafters. Moreover, the distribution was paid on account of petitioner's separation from the service of his employer. By remaining with Fotocrafters, which underwent a radical transformation as a result of the sale to Gateway, rather than becoming a Gateway employee (as all other Fotocrafters' employees did), petitioner was separated from *20 his employer. Accord, Funkhouser v. Commissioner,375 F. 2d 1 (4th Cir. 1967). On account of such separation, petitioner became ineligible to continue participating in the Trust so that the value of his interest in the Trust was distributed to him in one lump-sum payment. Therefore, since the distribution was paid on account of petitioner's separation from the service of his employer, and since respondent has not questioned the fulfillment of the other section 402(a)(2) requirements, we hold that the amount totaling $71,110.78 which petitioner received in 1971 as a lump-sum distribution from the Trust is capital gain pursuant to section 402(a)(2). Decision will be entered for the petitioner. Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954 as in effect during the year in issue.↩
2. SEC. 402. TAXABILITY OF BENEFICIARY OF EMPLOYEES' TRUST. * * *
(2) Capital Gains Treatment for Certain Distributions.--In the case of an employees' trust described in section 401(a), which is exempt from tax under section 501(a), if the total distributions payable with respect to any employee are paid to the distributee within 1 taxable year of the distributee on account of the employee's death or other separation from the service, or on account of the death of the employee after his separation from the service, the amount of such distribution * * * shall be considered a gain from the sale or exchange of a capital asset held for more than 6 months. * * *↩